KELLUM, Judge.
Charles Gregory Clark appeals the circuit court’s denial, after a hearing, of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he attacked his 1999 conviction for capital murder and His resulting sentence of death.
In 1999, Clark was convicted of murder made capital because it was committed during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended by a vote of 11-1 that Clark be sentenced to death, The trial court followed the jury’s recommendation and sentenced Clark to death for his capital-murder conviction. On appeal, this *292 Court initially remanded the case for the trial court to. correct deficiencies in its sentencing order. Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000). On return to remand, this Court affirmed Clark’s conviction and sentence of death. Clark v. State, 896 So.2d 584 (Ala.Crim.App.2003) (opinion on return to remand and on application for rehearing). The Alabama Supreme Court denied certiorari review, and this Court issued a certificate of judgment on October 1, 2004. The United States Supreme Court denied certiorari review on June 20, 2005. Clark v. Alabama, 545 U.S. 1130, 125 S.Ct. 2930, 162 L.Ed.2d 870 (2005).
Clark, through counsel, timely filed his Rule 32 petition on September 12, 2005, raising numerous claims, including claims of ineffective assistance of trial and appellate counsel. On December 27, 2005, the State filed an answer to Clark’s petition, arguing that all of Clark’s claims were insufficiently pleaded, meritless, and/or precluded. On January 13, 2006, Clark filed a reply to the State’s' answer and' a motion to amend, in which he raised additional claims. The circuit court granted Clark’s motion to amend. On February 16, 2006, the State filed an answer to the motion to amend, arguing that the claims in the motion to amend were insufficiently pleaded and/or precluded. On March .1, 2006, Clark filed an “Outline of His Rule 32 Petitions,” in which he expressly abandoned some of the claims raised in his petition and motion to amend and provided a brief synopsis of the claims he wished to pursue. (C. 449.) On June 12, 2006, the circuit court conducted an evidentiary hearing on Clark’s petition.- On or about April 1, 2013, Clark filed what he styled as his “Closing Argument.” (C. 468.) On July 23, 2013, the circuit court issued an order denying Clark’s, petition.[1] This appeal followed.
On direct appeal, this Court set out the facts of the crime as follows:
“The evidence adduced at trial indicated the following. On the evening of February 13, 1998, Clark went to the apartment of his girlfriend, Rhonda Kenny, in Pensacola, Florida. Kenny testified that Clark had driven to her apartment that evening at approximately 8:00 p.m. in his stepfather’s pickup truck. When Clark arrived, Kenny said, he was ‘high’ on crack, cocaine. Kenny testified, that, at that time, she and Clark had known each other for approximately a year and that they had often smoked crack cocaine together. According to Kenny, both she and Clark were employed and they both used them income to purchase crack cocaine. In addition, Kenny said, Clark often pawned his property and property belonging to his parents to obtain money to purchase crack cocaine. Approximately one week before February 13, 1998, Kenny said, Clark received an income-tax refund of $2,800; Kenny stated that Clark used the entire amount to purchase crack cocaine. At some point during the evening of February 13, 1998, Kenny said, Clark left her apartment and then later returned. ’ Kenny testified that when Clark returned he was walking and he told her that the truck had run out of gas and that he had walked back to her apartment. Kenny stated that she and Clark stayed up all night smoking crack cocaine and that Clark was ‘high’ when he left her apartment at approximately 5:00 a.m. on February 14, 1998, driving her Toyota Célica automobile. Kenny testified that she did not think that Clark was able to drive safely, but that *293 she gave him the keys to her car anyway. Just before Clark left her apartment, Kenny said, he borrowed $40 from her brother-in-law, which, she said, Clark promised to pay back the next day. Despite having borrowed $40, Clark told Kenny that he was going to drive to Seminole to borrow more money. Kenny testified that she did not see Clark carrying a knife that morning and that she had never known Clark to carry a knife.
“James E. lies testified that-on February 14, 1998, at approximately 7:20 a.m., he was driving On Fort Morgan Road in Baldwin County on his way to go fishing when he . passed a gasoline station/convenience store owned and operated by William Fuller Ewing. lies stated that he noticed two people outside the store; he said that one person was on his hands and knees in the parking lot and the other was walking toward a car parked at the gasoline pumps. As he passed the store, lies said,, he saw one of the men get into the car near the pumps and drive away in the same direction lies was traveling. lies testified that he decided to turn around and go back to the store to see what was happening. When he turned around and started back toward the store, lies passed the car that had been parked near the gas pumps. At that point, lies said, he changed his mind about going back to the store, and, instead decided to follow the car that had been at the store in order to identify it. lies turned around again and followed the car. lies got the license tag number-of the car and then pulled into another gas station/convenience store- and telephoned emergency 911.
“At approximately 7:45 a.m., Huey Mack; Jr., chief investigator for the Baldwin County Sheriffs Department, received a dispatch to go to Ewing’s store on Fort Morgan Road. When he arrived at the scene, Investigator Mack said, he saw Ewing’s body on'the ground in the doorway to the store; he stated that Ewing was positioned so that his feet were toward the gas pumps in fi-ont of the store and his head and chest were on the threshold of the door. Ewing had been stabbed numerous times. Over $600 in cash was found in Ewing’s billfold in his pants pocket. Investigator Mack testified that Ewing’s body was covered in blood and that blood on the ground extended approximately six feet outside the store and six feet inside the store. In addition, several droplets of blood were found on the check-out counter and on the floor behind the checkout counter. Investigator Mack also discovered a pack of cigarettes with a clump of what appeared to be bloody hair around it and a baseball-style cap on the floor in the entrance to the attendant’s area behind the check-out counter. Á stick was also found standing on end against the wall in the corner behind the counter. The cash register was on the floor in front of the check-out counter and there were loose coins on the floor and on the counter. The cash-register tape indicated that the last transaction rung up on the register was the previous evening, February 13,1998, at 8:52 p.m. One of the gasoline pumps in front of the store was on and the hose and nozzle of the pump were lying on the ground; that same pump indicated that approximately $14 in gas had been pumped from it. In' addition, a shoe print was discovered near the gas pumps.
“Dr. Leroy Riddick, a medical examiner with the Alabama Department of Forensic Sciences who was accepted by the trial court as an expert in forensic pathology, performed the autopsy on Ew *294 ing. Dr. Riddick testified that Ewing suffered 15 stab wounds, 17 superficial cuts, and several scrapes on his body, including on his back, his chest, his face, his arms, and his hands. Dr. Riddick stated that the wounds were most likely caused by a knife and that, because- of the presence and amount of blood in each wound,. in Dr. Riddick’s opinion, Ewing was alive when each wound had been inflicted; however, Dr. Riddick said that he could not determine the order in which the wounds had been inflicted. According to Dr. Riddick, the two stab wounds in the back were relatively deep wound's — they, in fact, struck bone — and ‘would take some degree of force.’ (R. 800.) In addition, Dr. Rid-dick stated that one of the stab wounds to the chest punctured Ewing’s heart. Dr. Riddick testified that the wound to the heart would have been fatal within a few minutes. Dr. Riddick also stated that there were a few wounds on Ewing’s hands and arms which he described as defensive wounds; however, Dr. Rid-dick stated that the lack of a significant number of defensive wounds on Ewing’s hands and arms indicated that Ewing and the perpetrator were in very close proximity — i.e., closer than two feet— struggling at the time of the stabbing.
“William Bentley Cowan, a corporal with the Gulf Shores Police Department, testified that on the morning of February 14, 1998, he was informed by the police-department dispatcher about a possible assault or homicide at a gas station on Fort Morgan Road. Cpl. Co-wan then drove to Fort Morgan Road in an attempt to find the gas station. He stopped at the first gas station he saw— Mo’s Landing, which is approximately 8 to 10 miles away from Ewing’s store. At Mo’s Landing, Cpl. Cowan was informed that a silver Toyota Célica automobile that had just driven past Mo’s Landing was involved in the incident at Ewing’s store. Cpl. Cowan reported the automobile and then drove east on Fort Morgan Road in an attempt to find it. Cpl. Cowan testified that, as he was looking for the car, he heard over the radio that another officer with the Gulf Shores Police Department, Justin Clop-ton, had stopped a vehicle matching the description. Cpl. Cowan thén went to assist Officer Clopton.
“Both Cpl. Cowan and Officer.Clopton identified Clark as the driver of the silver Toyota Célica automobile that Officer Clopton had stopped. Cpl. Cowan testified that Clark had a ‘fairly large amount’ of blood on his hands, his neck, and his clothes, particularly his jeans, but - that he did not see any cuts or wounds on Clark. (R. 777.) In addition, Clark had a bald spot near the crown of his head where it appeared that his hair had been pulled out. Officer Clopton stated that when he asked Clark where the blood on his clothes had come from, Clark said that he had gotten ‘in a scuffle ... with a guy down the road’ and that he had gotten a ‘scratch on his neck.’ (R. 896-97.) Cpl. Cowan stated that he saw a ski mask and a copy of the Mobile Register newspaper on the front passenger’s side floorboard of the ear and a ‘large wad of cash’ stuck between the two front, seats. (R. 781.) The ski mask was on top of the newspaper. No drugs or drug paraphernalia were found in the vehicle. Cpl. Cowan and Officer Clopton decided to detain Clark and they placed him in handcuffs and seated him ,in the back of Officer Clopton’s patrol car. Both Cpl. Cowan and Officer Clopton testified that Clark responded to their directions and that he did not appear intoxicated. Officer Clopton also testified that, when he ini *295 tially stopped Clark, Clark appeared nervous.
“Michael Cook, who- was an investigator with the Baldwin County Sheriffs Department in 1998, testified-that on the morning of February 14, 1998, he was dispatched to Ewing’s store on Fort Morgan Road. On his way to the store, Investigator Cook was told that a vehicle had been stopped in connection with the crime at the store, and he was instructed to go to where the vehicle was stopped rather than to the store. Investigator Cook said that when he arrived at the scene Clark was in the back of Officer Clopton’s patrol car. When he spoke with Clark, Investigator Cook said, Clark appeared ‘a little nervous,’ but he did not seem intoxicated. (R. 910.) Investigator Cook asked Clark if he could look in the vehicle and Clark told him that he could. Investigator Cook collected from the vehicle the money that was stuck between the two front seats, which totaled $897, and the newspaper and mask that were oh the floorboard of the front passenger’s side. The date on the newspaper was February 14, 1998. In addition, Investigator Cook took numerous photographs of the vehicle. One photograph, depicting the gas -gauge in the dashboard of the car, showed that the Toyota had a full tank of gas. Another photograph showed that the door to the gas tank was open.
“Clark was arrested and transported to the Gulf Shores Police Department. At the department, Clark was interviewed by Investigator Cook and Sergeant John Stewart, also with the Baldwin County Sheriffs Department. Sgt. Stewart read Clark ' his Miranda2 rights; Clark indicated that he understood those rights and then signed a waiver-of-rights form. - Sgt. Stewart and Investigator Cook both testified that Clark was never threatened and that he was never promised any reward for making a statement. In addition, both Sgt. Stewart and Investigator Cook testified that Clark did not appear to- be under the influence of alcohol or narcotics at the time of the interview. Sgt. Stewart and Investigator Cook initially spoke with Clark for approximately 20 minutes; during that interview, Clark explained his version of what had happened at Ewing’s store. In that initial statement, Clark indicated that he had wiped the blade of the knife he had used to stab Ewing on his pants. After the initial statement, Sgt. Stewart turned on a tape recorder, reread Clark his Miranda rights, and asked Clark to again explain his version of events. Clark then gave a tape-recorded statement.
“In- the tape-recorded statement, Clark admitted to stabbing Ewing, but he maintaiped. that he did so only because Ewing had attacked him. He also admitted to taking-a money bag from Ewing, but he claimed that he had no intent to rob Ewing until after he had stabbed him. . Clark stated that the day before the crime, February 13, 1998, he had spent the entire day in Pensacola, Florida, smoking crack cocaine. According to Clark, he had pawned items belonging to his stepfather and had also borrowed money to pay for the crack cocaine he had purchased and smoked that day. Sometime during the evening of February 13, 1998, Clark said, his stepfather’s truck had run out of gas and he had walked to Rhonda Kenny’s apartment. Early the next morning, February 14, 1998, he -had asked Kenny if he could borrow her car to drive to Seminole and she had agreed. Clark said that he left Kenny’s apartment about 4:45 a.m. and went to a house he owned'in Seminole to pick up his mail. After he got his mail, Clark said, he *296 began driving back to Pensacola. However, Clark stated that on the way, he decided to stop by a beach house owned by his mother and stepfather on Fort Morgan Road. When he got ready to leave the beach, house, Clark said, he noticed that the car was low on gas, so he stopped at the nearest gas station— Ewing’s store. Clark said that he had known Ewing for about 10 years. ,
“Clark stated that when he first arrived, Ewing was not yet at the store. Ewing arrived approximately 15 minutes later, Clark said, and he asked Ewing to turn on the gas pumps. .According to Clark, after the pumps were turned on, he put the nozzle in his car and set it on automatic; he then went inside the store and spoke with Ewing. Clark said that he asked Ewing for a pack of cigarettes arid that, as soon as Ewing got them and laid therri on the counter, the gas pump stopped. Ewing told- Clark that he owed approximately $14 for the gas. Clark stated that he paid for the gas and cigarettes and received change. - It was at that point, Clark said, that he saw Ewing’s money bag lying on the open drawer of the cash register. Clark said that he stayed and chatted with Ewing for approximately five minutes. When he turned to leave the store, Clark said, Ewing asked him if he was going to pay for his gas. According to Clark, he told Éwing that he had already paid for the gas, but Ewing said that he was going to call the sheriffs department and came around from behind the counter and approached him.
■ “Clark said that he and Ewing then ‘tussled, back and forth a little bit, just pushing and shoving.’ At that point, Clark said, .Ewing walked back behind the counter, got a stick, and came to the front of the • counter. According to Clark, he had a hunting-type knife in the ■ pocket of the jacket he was wearing[3] and, when Ewing drew the stick back as if to hit him (but before he actually did hit him), he* pulled out the knife and ‘started sticking him and cutting.’ They then fell' to the floor strugglingi and Clark continued to stab Ewing. - When this initial- struggle stopped, Clark said, Ewing went behind the counter and leaned over. Clark stated that he thought' Ewing was getting a gun, so he ■jumped on Ewing and began stabbing him again. ■ He and Ewing continued to struggle and they again ended up in front of the counter. Eventually, Clark said, he was able to get away from Ewing and leave the store; however, Ewing followed him outside and another struggle ensued. Clark stated that this struggle lasted for ‘just a minute’ because he stabbed Ewing one or two more times and Ewing then fell to the ground and quit fighting him. Clark said that he then walked to his car to leave, but that, when he was almost to his car, he remembered the money bag he had seen lying on the drawer of the cash register and he decided he wanted the money so he could buy more .crack cocaine; he then went back into the store and got the money bag. According to Clark, when he went back into the store to get .the money bag, Ewing was on the ground about halfway between the gas pumps and the front door to the store. When he came out of the store with the money bag, Clark said, Ewing was still in the same area, but he was attempting to get up and make it to the door of the store. Clark walked past Ewing on his way to the car, took the gas nozzle out of the car, laid it on the ground, and got in the car to leave. At that point, Clark said, he saw that Ewing was near the front door of the store on one knee struggling to get off the ground to open the door.
*297 “Clark stated that he then left the scene. As he was driving away, Clark said, he threw the knife he had used to stab Ewing out of the car .window. Shortly after disposing of the knife, he saw a garbage can on the side of the road, and he stopped and threw away the money bag. A short time after he got rid of the money bag, Clark said, he was stopped by a Gulf Shores police officer.
“Throughout his , statement, Clark maintained that he had had no intent to rob Ewing, that he merely remembered the money bag after the stabbing, and that he had decided he could use the money to buy more crack cocaine. He also maintained that the only reason he had stabbed Ewing the first time.was because he thought Ewing was going to hit him with the stick and that he had jumped on Ewing and had stabbed him again when Ewing was behind the counter only because he thought Ewing was getting a gun. Clark stated that during the struggle with Ewing, Ewing had hit him several times and 'had also pulled his hair. ’
“Following the interview, Investigator Cook and Sgt. Stewart asked Clark if he would go to Fort Morgan Road with them and show them where he had thrown the knife and the bank bag out of the car. Clark agreed. The bank bag was found in a garbage can on Fort Morgan Road. In the bag was a checkbook belonging to Ewing. Investigator Cook and Sgt. Stewart also found a pocketknife on the side of Fort Morgan Road, although they did not believe it was the murder weapon. The record reflects that local residents found two additional knives on the side of Fort Morgan Road some time after the murder; one was found a mile from Ewing’s store. Both of those knives were given to Dr. Riddick to compare with the victim’s wounds and were.then given to the Department of Forensic Sciences.. Dr. Riddick testified that, in his opinion,.either or both of the knives could have caused Ewing’s injuries. Blood was discovered on both knives, but neither knife had a sufficient amount- of blood for DNA testing. ' Investigator Mack testified that, based-on its color and texture, he believed the hair discovered at'the crime scene bélonged to Clark. In addition,' the evidence indicated that the shoeprint discovered near the gas pumps at Ewing’s store matched the soles of the' shoes Clark was wearing when he was arrested.
“Elaine Scott, a forensic biologist with the Alabama Department of Forensic Sciences, testified that she tested several items of evidence involved in this case for the presence of blood. She found blood on the stick that was discovered behind the counter at the store; however, the amount of blood was so little (it was,, in fact, not visible to the naked eye) that further testing was not feasible. Scott also found blood on the jeans, the .T-shirt, and the boots that Clark was wearing when- he was arrested, and on .swabs that were taken from Clark’s hands and neck. William Harris Jones, also a forensic biologist with the Alabama. Department of Forensic . Sciences, testified that he did DNA testing on the blood from the jeans and the swabs from Clark’s neck and right hand. Jones stated that the blood on the jeans and on Clark’s neck was the victim’s. In addition, he stated that the blood on Clark’s right hand contained DNA from both the victim and from Clark.[4]
“Hollis Byrd, Ewing’s brother-in-law, testified that he was Ewing’s silent partner in the store and that he took care of the business’s finances, while Ewing operated the store. According to Byrd, *298 Ewing had been in an accident almost 30 years earlier and had been injured, both physically and mentally. Because of the accident, Ewing was unable to work at a regular job, so Byrd helped him get the store started. According to Byrd, Ewing could not read and write very well and he could not make change very well without the use of the cash register. Byrd testified that Ewing’s normal practice when he opened the store in the morning was to put approximately $50 in the cash register and to keep the remainder of the cash for the store in the bank bag behind the counter. In addition, Byrd said, Ewing kept a large amount of his own money in his pants pocket.
“Clark pleaded not guilty and not guilty by reason of mental disease or defect. Through his counsel, he asserted three ‘defenses’ at trial: (1) that he was insane at the time of the crime; (2) that he acted in self-defense because, he said, Ewing had attacked him and he had feared for his life; and (3) that, although he killed Ewing and took Ewing’s money bag, his crime did not constitute capital murder. As to this third ‘defense,’ Clark asserted two arguments. First, he argued that he was not guilty of capital murder because, he said, the taking of the money bag was not part of the killing, but was a mere afterthought. Second, he argued that he was suffering from cocaine intoxication and/or cocaine withdrawal at the time of the crime to the extent that he could not form the intent to kill or the intent to rob. According to Clark, he was in a paranoid state and was responding to a perceived threat from Ewing at the time of the crime.
“In support of his defenses, Clark called Marianne Rosenzweig, a clinical psychologist hired to evaluate Clark to determine his mental state at the time of the crime. Dr. Rosenzweig stated that she interviewed Clark; that she examined police reports, witness statements, crime scene findings, and the autopsy report; and that she interviewed several members of Clark’s family and employees of the jail where Clark had been housed after the murder. In addition,Dr. Rosenzweig testified that she had experience working with individuals addicted to narcotics, including crack cocaine. According to Dr. Rosenzweig, small doses of crack cocaine initially produce euphoria and increased attentiveness, but as the doses increase and the addiction begins, individuals will experience anxiety, nervousness, irritability, confusion, and paranoia, not only while they are using cocaine, but also during periods of withdrawal. Dr. Rosenzweig further testified that crack cocaine produces a high instantaneously, unlike other forms of cocaine, which take more time to affect the system. She also stated that the high from crack cocaine is more intense than that from other forms of cocaine, but that it abates much more quickly, after approximately 15 minutes. As a result, Dr. Rosenzweig said, crack cocaine is more addictive than other forms of cocaine.
“Dr. Rosenzweig testified that her evaluation of Clark revealed that he was addicted to crack cocaine and that he was suffering from paranoia. Dr. Rosenzweig stated that it was her opinion that, at the time of the murder, Clark was suffering from withdrawal, that his judgment was impaired due to paranoia, and that, as a result of his cocaine addiction and paranoia, he did not intend to kill Ewing. However, Dr. Rosenzweig testified that cocaine use and withdrawal would not necessarily prevent an individual from forming the intent to kill. Dr. Rosenzweig also testified that, in her *299 opinion, at the time of the murder, Clark was sane, he knew the difference between right and wrong, and he knew he was committing a crime.
“In rebuttal, the State called Robert Anthony DeFranscisco, a clinical forensic psychologist appointed by the court to evaluate Clark. Dr. DeFranscisco testified that, in his opinion, Clark was sane at the time of the murder and that, although Clark was suffering from either cocaine intoxication or cocaine withdrawal at the time of the murder that most likely impaired his judgment to some degree, he believed that Clark ‘knew what he was doing1 at the time of the murder. (R. 1287.) However, Dr. DeFranscisco stated that it would be impossible to know for certain whether Clark was suffering from paranoia to the extent that he perceived a threat from Ewing that was not, in reality, there, and then responded in what Clark believed was self-defense, or if Clark intentionally killed Ewing in order to obtain money to purchase more cocaine to support his addiction.
“2Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
“ 3Clark said that he had the knife in his jacket pocket because, when he had run out of gas the previous evening, he had been in a bad neighborhood, so he took the knife out of the glove compartment of his stepfather’s truck and carried it with him as he walked to Kenny’s apartment. According to Clark, he left the sheath for the knife in the glove compartment of the truck.
“ 4According to Jones, the reason the blood on Clark’s hand contained his own DNA was because it is next to impossible to swab blood off of human tissue and not get some DNA from the tissue as well as from the blood.”
Clark, 896 So.2d at 698-604 (opinion on return to remand and on application for rehearing).
In his brief on appeal, Clark does not appear to pursue many of the claims he raised in his Rule 32 petition and motion to amend. It is well settled that this Court “will not review issues not listed and argued in brief.” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). “ ‘[Al]legations ... not expressly argued on ... appeal ... are deemed by us to be abandoned.’” Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991)(quoting United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.1981)). Those claims Clark raised in his petition but does not argue on appeal are deemed abandoned and will not be considered by this Court.
Clark does appear to pursue in his brief on appeal some of the claims of ineffective assistance of trial counsel and appellate counsel that he raised in his petition.[2] As noted above, the circuit court *300 held a-hearing on Clark’s petition; at that hearing, Clark presénted testimony from his two trial attorneys, James May and William Pheifer. Clark presented no testimony from his appellate counsel, Stephen Strickland, who was also the attorney who filed Clark’s Rule 32 petition and who represented Clark at the hearing.
‘“The burden of proof in a Rulé 32 proceeding rests solely with the petitioner, not the State.’ Davis v. State, 9 So.3d 514, 519 (Ala.Crim.App.2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007). ‘[I]n a Rule 32, Ala. R.Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence,’ Wilson v. State, 644 So.2d 1326, 1328 (Ala..Crim.App.1994). Rule 32.3, Ala.R.Crim. P.1, specifically provides that ‘[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.’ ”
Wilkerson v. State, 70 So.3d 442, 451 (Ala.Crim.App.2011).
 “[WJhen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). Also, “where a trial court does not receive' evidence ore terms, but instead makes its judgment based on the pleadings, exhibits, and briefs, ... it is the duty of the appellate court to judge the evidence de novo” Ex parte Horn, 718 So.2d 694, 705 (Ala.1998). Likewise, when a trial court makes its judgment “based on the cold trial record,” the appellate court must review the evidence de novo. Ex parte Hinton, 172 So.3d 348, 352 (Ala.2012).
“However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)). “When conflicting, evidence is presented ... a presumption of correctness is applied to the court’s factual determinations.” State v. Hamlet, 913 So.2d 493, 497 (Ala.Crim.App.2005). This is true “whether the dispute is based entirely upon' oral testimony or upon a combination of oral testimony and documentary evidence.” Parker Towing Co. v. Triangle Aggregates, Inc., 143 So.3d 159, 166 (Ala.2013) (citations omitted). “The credibility of witnesses is for the trier of fact, whose finding is conclusive on "appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.” Hope v. State, 521 So.2d 1383, 1387 (Ala.Crim.App.1988). Indeed, it is well settled that, in order to be entitled to relief, a posteonviction “petitioner must convince the trial judge of the truth of his allegation and the judge must ‘believe’ the testimony.” Summers v. State, 366 So.2d 336, 343 (Ala.Crim.App.1978). See also Seibert v. State, 343 So.2d 788, 790 (Ala.1977).
“ ‘In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged. test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“ ‘ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so ser *301 ious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the. deficient performance prej-udieed the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders thé result unreliable.”
“ ‘466 U.S. at 687, 104 S.Ct. at 2064.
“‘“The .performánce component outlined in Strickland' is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable considering all the circumstances.’ ” Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995)], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on . the facts of the particular case, viewed as of. the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“‘The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff’d, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’ [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.” Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985). “This court must avoid using ‘hindsight’ to evaluate' the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.” Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App.1994).
“‘“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission, of counsel was unreasonable. A fair, assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls .within the wide range of reasonable professional assistance; that is, the defendant must *302 overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
“ ‘Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“ “Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.”
“ ‘Daniels, 650 So.2d at 552.
“ ‘ “When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentence including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”
“‘Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
[[Image here]]
“Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App.1997), cert. denied, 717 So.2d 6 (Ala.1998).”
Dobyne v. State, 805 So.2d 733, 742-44 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001).
“The standards for determining whether appellate counsel was ineffective are the same as those for determining whether trial counsel was ineffective.” Jones v. State, 816 So.2d 1067, 1071 (Ala.Crim.App.2000), overruled on other grounds, Brown v. State, 903 So.2d 159 (Ala.Crim.App.2004). “The process of evaluating a case and selecting those issues on which the appellant is most likely to prevail has been described as the hallmark of effective appellate advocacy.” Hamm v. State, 913 So.2d 460, 491 (Ala.Crim.App.2002). As this Court explained in Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000), overruled on other grounds, Ex parte Taylor, 10 So.3d 1075 (Ala.2005):
“As to claims of ineffective appellate counsel, an appellant has a clear right to effective assistance of counsel on first appeal. Evitts v. Lucey, 469 U.S, 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). However, appellate counsel has no constitutional obligation to raise every non-frivolous issue. Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The United States Supreme Court has recognized that ‘[experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.’ Jones v. Barnes, 463 U.S. at 751-52, 103 S.Ct. 3308. Such a winnowing process ‘far from being evidence of incompetence, is the hallmark of effective advocacy.’ Smith v. Murray, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief *303 on appeal. Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir.1993), cert. denied, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993). One claiming ineffective appellate counsel must show prejudice, i.e., the reasonable probability that, but for counsel’s errors, the. petitioner-would have prevailed on appeal. Miller v. Keeney, 882 F.2d 1428, 1434 and n. 9 (9th Cir.1989).”
766 So.2d at 876.
Moreover, in reviewing claims of ineffective assistance of counsel, this Court need not consider both prongs of- the Strickland test. See Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987) (“In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the 'prongs.”). .Because both prongs of the Strickland test must be satisfied- to establish ineffective assistance of counsel, the failure to establish one of the prongs is a valid basis, in and of itself, to deny the claim. As the United States Supreme Court explained:
“Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components • of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not deter-, mine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the groun^ of lack of sufficient prejudice, which we expect will often be so, that course should be followed.”
Strickland, 466 U.S. at 697.
With these principles in mind, we address each of Clark’s claims in turn.
I.
Clark first appears to contend on appeal that his trial counsel were ineffective in their choice of defense theories during the guilt phase of .his trial. Clark argues that the defenses counsel asserted at trial were weak, and unsupported by the evidence and that counsel should have abandoned those theories and, instead, argued that because the victim, William Fuller Ewing, was alive when Clark left the scene, Clark could not have had the intent to kill Ewing. According to Clark, this lack-of-intent theory was supported by the evidence and would have resulted in his being convicted of the lesser-included offense of felony murder instead of capital murder.[3] In its order, the circuit court found that Clark had failed to prove either that his counsel’s performance was deficient in this regard or that he was prejudiced by counsel’s performance. We agree..
As noted in our opinion on direct appeal, Clark’s counsel obtained and presented extensive evidence at trial regarding Clark’s addiction to crack cocaine and the effects such an addiction can have on a person’s mental state. Indeed, both Clark’s expert *304 and the State’s expert testified that, at the time of the crime, Clark’s judgment was impaired at least to some degree as a result of either cocaine intoxication or cocaine withdrawal. Armed with this evidence, trial counsel pursued three theories of defense at trial, all of which were interrelated and grounded, at least in part, on Clark’s assertion that he was suffering from either cocaine intoxication or cocaine withdrawal so severe at the time of the crime that it impaired his judgment and his ability to accurately perceive and appropriately react to his surroundings. Counsel asserted: (1) that Clark was insane at the time:of the crime; (2) that Clark acted in self-defense when he perceived, although perhaps mistakenly, a threat against his' life -from Ewing and acted on that threat by stabbing Ewing; and (3) that the crime did not constitute capital murder because the robbery was a mere afterthought and because Clark did not have the mental acuity at the time of the crime to form the intent to kill or the intent to rob.
At the evidentiary hearing, trial counsel James May testified that “[t]here was little dispute about the facts” of Clark’s case and that the evidence against Clark was overwhelming. (R. 7.) According to May, during both the guilt phase and the' penalty phase of the trial, “[t]he defense in the case had to do with [Clark’s] state of mind at the time of the offense” (R. 7), because, in May’s opinion, a not-guilty verdict in this case was “[n]ot likely.” (R. 10.) May testified that there was evidence indicating that Ewing was alive when Clark left the scene specifically a witness who saw Ewing alive as Clark was leaving the scene, and that there was “no evidence that [Clark] made any effort to be sure that [Ewing] was dead.” (R. 36.) May also testified that he believed, based on Clark’s statement to police, that Clark believed that Ewing was still alive even at the time Clark gave his statement after his arrest. However, May stated: “I'don’t think the fact that the witness saw [Ewing] alive in the parking lot supports the theory that [Clark] left without being sure [Ewing] was dead. Those two things happened but I don’t necessarily see a connection between the two.” (R. 36.) May stated that he could not recall whether he mentioned the fact that Ewing was still alive when Clark left the scene either in his opening statement or his closing argument at the guilt phase of the trial. May said, however, that in his opinion the fact that Ewing was still alive when Clark left the scene “would support. .,. felony murder.” (R. 38.) May testified that he did not recall whether he stated in closing argument that the jury had to find a specific intent to kill in order to convict Clark of capital murder or that the lack of an intent to kill would necessitate a finding of felony murder instead of capital murder; however, May said that he hoped he had said something to that effect during closing argument.
When asked by the circuit court the reason he chose to. pursue the defense theories that he pursued, May explained:
“Well, I can tell you what my thought processes were at the time because I remember this case. I knew [Clark], As I’ve said, I represented him before. And I think'I knew the facts of this case as well as I’ve known the facts of any case. They weren’t good. It wasn’t pretty. There was really only a hint of the defenses that we did present evidence about. This was not a case where we expected to come into trial and have the jury come back not guilty.
“This was not a case where we expected not to have a penalty phase. We expected the jury in this case to come back with a guilty verdict.
*305 “And at the time, [the trial judge], I knew her, and I knew how she ruled and how she felt about things. And from the very beginning in the case, it was, to say the least, a difficult case.
“I said earlier, there are some cases you don’t want to argue the facts. This is one of those cases. The facts in this case were tragic. They were terrible'.
“I repeatedly told the jury that the reason we had injected the use of drugs and the intoxication from crack cocaine was not as an excuse.
“Baldwin County jurors tend to see things in a much more black and white — black or white fashion than jurors in other parts of the state, for example Jefferson County, Tuscaloosa County, Montgomery County. People here, a murder’s a murder.
“The whole focus of the defense in this case, and it was granted by a loose-knit theory of defense, was to keep from killing him. This was the whole thing we wanted to do.
“The reason we didn’t withdraw the insanity defense even though there was little, if any, evidence to support it — we knew the judge would charge on it — it would give the jury an opportunity to say we’re not going to kill him.
“The reason we used the self-defense defense which was iffy at best was to give the jury an opportunity to say we’re not going to kill him.
“The reason we argued the felony murder offense as it was argued — and we didn’t beat the jury over the head with felony murder. We didn’t- use those words, I don’t think, often. We used, instead, the theory that there was no intent to rob and no intent to kill, and we tried to do that so as to find support in the fact of his intoxication by the use of crack cocaine and his inability to form an intent.
‘We spent a lot of time with Dr. Rosenzweig about that. It didn’t work but we had very bad facts. We had no typical defense.
■“If there was a -theory of defense in the case, it was don’t kill him. Basically, that’s about -all we hád in the case, and we wanted the jury to have as many opportunities as we could give them to say we’re not. going to kill him. It didn’t work but that was all we had.”
(R. 81-83.) When -asked by the circuit court, May also said-that he had discussed the defense theories with Clark before trial. May explained:
Well, like I said a minute ago, what [Clark] said happened was consistent throughout-the whole thing so we had only that limited opportunity to develop defenses based on what [Rule 32 counsel] asked us earlier about self-defense which was weak. And we knew it was weak and we pointed out to [Clark] that that was not a tight defense but was one that we could use. And the lack of intent as a result of his crack addiction, that was consistent- throughout, and we talked about that. And, of course, that’s why we hired [Dr. Rosenzweig] because of her expertise in that particular area. Actually, we wanted her husband Sheldon Rosenzweig. He is more of an addictionologist than :[his wife] is but she’s quite capable. . And then we had the afterthought about the robbery, and there was some conversation among [Clark] and [cocounsel William Pheifer] and I about how to develop that and the evidence of that or the lack of evidence which would have supported our theory that it was an afterthought, blood smat-ters and smears and things like that. But we talked about those things. I suspect that I talked to [Clark] — I don’t know — I’m guessing maybe three or four or five times by myself. I really *306 can’t say. I don’t remember. And then, as I say, I think a time or two [Pheifer] was there and then I believe [Pheifer] went and talked to him on other occasions when we had questions come up or particular things we wanted to know about, although things never changed. It stayed the same all the way through.
[[Image here]]
“Based on what we knew, [the defenses] were pretty well apparent or the defenses which we could argue were pretty well apparent. And we were unable to come up with any others during the course of the preparation.
[[Image here]]
“I don’t know that [Clark] articulated any desire about how the case would come out or what we were supposed to do. Obviously, the effort was to present a defense, and an idiot knows that if it’s a capital case, you’re not only looking for an acquittal, as you would be in any other case which would have been unlikely in this case, but you’re looking for some verdict that would require punishment of life or life without parole as opposed to death. I think that’s where we were from the beginning of the case, and I think we stayed there all the way through.”
(R. 134-36.) Finally, when asked by the circuit court whether there was anything that, in hindsight, May believed he did not adequately pursue during trial, May said:
“I regret not having developed that aspect of the intent to kill evidence, the fact that [Ewing] was still alive when he came out, that [Clark] didn’t go back and finish him off or left knowing he was still alive. I regret not developing that more fully because it may have made a difference but I don’t know of anything other than just generally beating myself up about not winning the case or about him having gotten the death penalty. Other than that, I can’t think of anything specific.”
(R. 138.)
“Trial counsel’s decisions regarding what theory of the case to pursue represent the epitome of trial strategy.” Flowers v. State, 2010 Ark. 364, 370 S.W.3d 228, 232 (2010). “What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.” State v. Miller, 194 W.Va. 3, 16, 459 S.E.2d 114, 127 (1995).
“ “[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel’s failure to present that theory.”’ Hunt v. State, 940 So.2d 1041, 1067 (Ala.Crim.App.2005), quoting Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 513 (S.D.N.Y.2005). ‘Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel.’ People v. Eisemann, 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40-41 (1998).”
Davis v. State, 44 So.3d 1118, 1132 (Ala.Crim.App.2009). “‘The fact that [a] defense strategy was ultimately unsuccessful with the jury does not render counsel’s performance deficient.’ ” Bush v. State, 92 So.3d 121, 160-61 (Ala.Crim.App.2009) (quoting Heath v. State, 3 So.3d 1017, 1029 (Fla.2009)). See also Johnson v. State, 769 So.2d 990, 1001 (Fla.2000) (“‘Simply because the ... defense did not work, it does not mean that the theory of the defense was flawed.’ ” (citations omitted)).
Here, Clark failed to prove that counsel’s decision regarding what defense theories to present was not sound trial strategy. The most Clark proved was the unremarkable fact that, with the luxury of time and the opportunity to focus *307 resources on specific facts of an already made record, postconviction counsel will inevitably be able to identify alternative defense theories that could have been pursued. However, we cannot view counsel’s performance in hindsight. Rather, we must view counsel’s decisions at the time they were made. Here, it is clear that counsel’s decision .to pursue the three defense theories that counsel pursued was reasonable .and strategic and was based on the evidence and circumstances known to counsel at the time of Clark’s trial, including Clark’s own statement to police and his statements to counsel in which he steadfastly maintained that he had acted in self-defense, that he had no intent to kill, and that the robbery was an afterthought. See Strickland, 466 U.S. at 691 (“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions.”).
Moreover, contrary to Clark’s belief, even if Ewing was still alive when Clark left the scene, that does not necessarily indicate that Clark had no intent to kill Ewing. “It is' the rare killer indeed who, after inflicting a mortal wound intended at a minimum to cause serious physical injury, lingers at the scene of the crime or summons aid.” People v. Suarez, 6 N.Y.3d 202, 209, 811 N.Y.S.2d 267, 273, 844 N.E.2d 721, 727 n. 3 (2005). It is well settled that intent to kill “‘“may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.”’” Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991) (quoting in turn Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980))). However, merely “because the jury may infer intent to kill from conduct designed to ensure that the intended victim actually was dead [does not mean that] the jury may not infer intent to kill if the intended victim was alive when the defendant left the scene, regardless of the. other circumstances of the crime.” State v. Lopez, 280 Conn. 779, 819, 911 A.2d 1099, 1126 (2007). In other words, even if Ewing was alive when Clark left the, scene, that would be only one of many attendant circumstances to be considered by the. jury when determining, whether Clark had the intent to kill.
The record from Clark’s direct appeal reflects that Clark stabbed and cut Ewing more than 30 times during a struggle that spanned several minutes and that occurred over a wide peripheral area-both inside and outside Ewing’s convenience store. Suffice it to say, after thoroughly reviewing the record . from Clark’s direct appeal, it is clear to us that even had trial counsel argued to the jury that Clark had lacked the intent to kill because Ewing was still alive when Clark left the scene, there is no reasonable probability that- the outcome of Clark’s trial would have been different. Indeed,-we have no doubt that the outcome of Clark’s trial would have been the same even had trial counsel pursued Clark’s newfound defense.
Therefore, Clark failed to prove either that his trial counsel’s choice of defense theories was deficient or that counsel’s choice prejudiced him, and the circuit court properly denied this claim of ineffective assistance of counsel.
II.
Clark also contends on appeal that his trial counsel were ineffective for- not requesting a jury instruction on heat-of-passion manslaughter as a lesser-included offense of the capital-murder charge.
*308 On direct appeal, this Court addressed the propriety, of a jury instruction on heat-of-passion manslaughter as follows:
“Clark also éontends that the trial court erred in not instructing the jury on heat-of-passion (provocation) manslaughter, see § 13A-6-3(a)(2), Ala.Code 1975, as a lesser-included offense of capital murder. (Issue V in Clark’s appellate brief.) He argues that there was a reasonable theory of the evidence from which the jury could have concluded that he stabbed Ewing due to a sudden heat of passion aroused in him when Ewing approached- him wielding a stick. He refers to the well-established precedent that heat-of-passion manslaughter is ‘“designed to cover those situations where the -jury does -not believe a defendant is guilty of murder but also' does not believe the killing was totally justified by self-defense.’” Williams v. State, 675 So.2d 537, 541 (Ala.Crim.App.1996), quoting Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985), According to Clark, the jury in this case- could have concluded, based on his statement to the police, that, although the killing was not totally justified by self-defense, he was nevertheless ‘not guilty of murdering E-Wing.
“The record' reflects that the trial court instructed the jury on felony murder, intentional murder,,reckless-manslaughter, and criminally negligent homicide as lesser-included offenses, of capital murder. During the charge conference, the trial court specifically asked Clark’s counsel if he also wanted the jury to be charged on heat-of-passion manslaughter; Clark’s counsel replied, ‘No, . This is not a heat of passion.’ (R. 1315.) Any error, therefore, in the trial court’s not charging the jury on heat-of-passion manslaughter was invited by Clark himself. ,
.“‘“‘“‘A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted-to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.’ ” ’ Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App.1995), aff’d, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990). As we have said in applying the invited-error -doctrine, ‘ “It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.” ’ . Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). ‘The invited error rule has been applied equally in capital cases and noncapital cases.’ Rogers v. State, 630 So.2d 78, 84 (Ala.Crim.App.1991), rev’d on other grounds, 630 So.2d 88 (Ala.1992), aff’d on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App.1992), aff’d, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).”
“‘Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff’d, 808 So.2d 1143 (Ala.2001). “ ‘An invited error is waived, unless it rises to the level of plain error.’ ” Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff’d, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s *309 ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff’d, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).’
“McNabb v. State, 887 So.2d 929, [982-83] (Ala.Crim.App.2001).
“ ‘A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.’ MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). An accused has the right to have the jury charged on ‘“any material hypothesis which the evidence in his favor tends to establish.” ’ Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). ‘[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility,’ Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978), ‘even if the evidence supporting the charge is offered by the State.’ Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, ‘[t]he court shall not charge, the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ § 13A-1-9(b), Ala.Code 1975. ‘The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.’ Broadnax v. State, 825 So.2d 134, 200 (Ala.Crim.App.2000), aff’d, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). ‘ “A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.”’ Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987).
. “In this case, there was no reasonable or rational theory from the evidence to support a charge on heat-of-passion manslaughter. The only evidence Clark points to, and the only possible evidence that could have been used to argue heat-of-passion manslaughter, was Clark’s statement to the police in which he told police that he stabbed Ewing only after Ewing had approached him wielding a stick. However, the Alabama Supreme Court has recognized that, in certain situations, an accused’s self-serving statement may not'be sufficient, by itself, to warrant an instruction on a lésser-included offense. See Ex parte McWhorter, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). In McWhorter, the appellant had given a statement to the police in which he initially stated that he was so intoxicated that he did not remember the crime. As the interview with police continued, however, the appellant began to remember, in detailj how the crime, was committed, and he confessed. On appeal, he argued that the trial court had erred in not instructing the jury on a number of lesser-included offenses (including felony murder, intentional murder, and manslaughter), based on his; statement to the police that he had been intoxicated. In .finding that the trial court had not,erred in not instructing the jury on the lesser- *310 included offenses, the Supreme Court stated:
“ ‘The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent, with his own statement giving detailed descriptions of the events occurring at the crime scene. No evidence substantiated his claim to have been intoxicated at the time of the killing, and, indeed, the other evidence as to his condition at the time of the crime was totally consistent with the proposition that he was sober. We hold that McWhorter’s self-serving statements suggesting he was intoxicated at the time of the killing, statements made in his internally inconsistent interview by Detective Maze, is, as a matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity.’
“Ex parte McWhorter, 781 So.2d at 342 (emphasis added).
“Although McWhorter did not involve the same factual situation as that presented here, we find the Alabama Supreme Court’s opinion in McWhorter to be persuasive in our resolution of this issue. In this case, as in McWhorter, the only evidence supporting a charge on heat-of-passion manslaughter was Clark’s self-serving statement to the police. ' Although that statement was not internally inconsistent, as was the statement in McWhorter, it was directly refuted by undisputed physical evidence from the crime scene. When police officers arrived at the crime scene; the stick that Clark claimed Ewing had wielded as he approached Clark in front of the checkout counter was found propped up on end against the wall in a corner behind the counter. Under Clark’s theory of the case, either he or a stabbed and bleeding Ewing must have taken the time at some point either during the struggle or after the struggle to walk behind the counter and place the stick on end up against the wall. This theory is simply not reasonable.
“We will not find plain error in a trial court’s refusal to instruct a jury on a lesser-included offense where the only evidence tending to bring the crime within the definition of that lesser-included offense is a defendant’s self-serving statement and where that statement is directly refuted by undisputed physical evidence. We hold, therefore, that under the circumstances in this case, it was riot plain error for the trial court not’to instruct the jury on heat-of-passion manslaughtér as a lesser-included offense of capital murder.”
896 So.2d at 640-42.
As he did on direct appeal, Clark again argues that the evidence presented at trial supported an instruction on heat-of-passion manslaughter. Specifically, Clark asserts that testimony from his trial establishing that there was a struggle between him and Ewing and that Ewing was still alive when Clark left the scene supported an instruction on heat-of-passion manslaughter arid made “the heat-of-passion manslaughter instruction ... the perfect instruction for the defense.” (Clark’s brief, p. 36.) In its order, the circuit court found that Clark had failed to prove either that his counsel’s performance was deficient in this regard or that he was prejudiced by counsel’s performance. We agree with the circuit court that Clark failed to prove that his counsel’s performance was deficient; therefore, we need not address whether Clark was prejudiced.
It is well settled that “a ‘request for jury instructions is a matter of trial strategy and, absent a clear showing of *311 improper or inadequate representation, is to be left to the judgment of counsel.’” Maxwell v. State, 620 So.2d 93, 97 (Ala.Crim.App.1992) (quoting Parker v. State, 510 So.2d 281, 286 (Ala.Crim.App.1987)). “Trial counsel should have the broadest discretion in all matters of trial strategy.” Vinson v. State, 494 So.2d 175, 177 (Ala.Crim.App.1986). “[E]ven .if the evidence supports, jury instructions on lesser included offenses,'the failure of counsel to request charges on the pertinent lesser included offenses does not necessarily render counsel’s assistance ineffective.” Parker, 510 So.2d at 286.
In this case, we have no trouble concluding that counsel’s decision not to request a jury instruction on heat-of-passion manslaughter did not constitute deficient performance. At the evidentiary hearing, May testified that he did not believe -that “the evidence supported” a jury instruction on heat-of-passion manslaughter. (R. 130.) May was correct.
As this Court noted on direct appeal, the only evidence tending to bring this crime within heat-of-passion manslaughter was Clark’s own self-serving statement to police that Ewing attacked him with a stick, a statement that was refuted by undisputed physical evidence at the crime scene. Contrary to Clark’s contention, the testimony from State’s witnesses at trial that Clark and Ewing struggled does .not indicate that Ewing attacked Clark, nor does the fact that a witness saw Ewing alive when Clark was still at the scene indicate that. Ewing attacked Clark. For the reasons explained in our opinion on direct appeal, Clark was not entitled to a jury instruction on heat-of-passion manslaughter. See Clark, 896 So.2d at 640-42. See also Harbin v. State, 14 So.3d 898, 909-911 (Ala.Crim.App.2008)(holding that, where the only evidence supporting a jury instruction on a lesser-included offense was the defendant’s own self-serving statements to police, the-trial court did not. err in refusing the requested instruction). Counsel cannot be deficient for not requesting a jury instruction for which there is no evidence in support. See, e.g., McGahee v. State, 885 So.2d 191, 209 (Ala.Crim.App.2003).[4]
Therefore, trial counsel’s decision not to request a jury instruction on heat-of-pas *312 sion manslaughter did not constitute deficient performance, and the circuit court properly denied this claim of ineffective assistance of counsel.
III.
Clark also contends on appeal that his appellate counsel was ineffective for: (1) “failing to point out that [on direct appeal this] Court .,. erroneously adopted the evidence tending to support the theory more favorable to the State instead of the evidence tending to support the theory more favorable to Clark of heat-of-passion self-defense” after this Court rejected Clark’s appellate argument that he was entitled to á jury instruction on heat-of-passion manslaughter (Clark’s brief, pp. 42-43); and (2) not raising on appeal the issue whether the trial court erred in refusing his requested jury instruction “concerning the lack of intent to rob defense.” (Clark’s brief, p. 44.) In its order, the circuit court found, in relevant part, that Clark had- failed to prove these claims of ineffective assistance of appellate counsel because, Clark had failed to call his appellate counsel to testify at the Rule 32 hearing. We agree.
Clark did not call his appellate counsel, Stephen Strickland, to testify at- the evidentiary hearing. Strickland, .who also represented Clark in the Rule 32 proceedings, did attempt to call himself to testify on Clark’s behalf at the hearing. However, the circuit court refused to allow Strickland to act both as Clark’s advocate and as a witness. See Rule 3.7, Ala. R. Prof. Cond. The circuit court did give Clark the opportunity to have Strickland withdraw from representing him in the Rule 32 proceedings so that Strickland could then testify regarding the claims of ineffective assistance of appellate counsel, but Clark declined to have Strickland withdraw. Instead, Clark chose to rely solely on the briefs Strickland filed on direct appeal as evidence in support of his ineffective-assistance-of-appellate-counsel-claims.
However, “[i]t is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim.” Broadnax v. State, 130 So.3d 1232, 1255 (Ala.Crim.App.2013). “[T]o overcome the strong presumption of effectiveness, a Rule 32 petitioner must, at his evidentiary hearing, question ... counsel regarding his or her actions or reasoning.” Stallworth v. State, 171 So.3d 53, 92 (Ala.Crim.App.2014). “When a record is silent as to the reasons for an attorney’s actions we must presume that counsel’s conduct was reasonable.” Hooks v. State, 21 So.3d 772, 793 (Ala.Crim.App.2008). “Tf the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.’” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)).
Because Clark failed to call his appellate counsel to testify at the evidentiary hearing regarding these claims, .the record is silent as to whether appellate counsel’s decision not to make the arguments listed above was strategic. Although the briefs appellate counsel filed bn appeal certainly establish what arguments counsel did and did not make, they shed no light on the reasoning behind counsel’s actions and are not sufficient, by themselves, to prove that appellate counsel was ineffective. ‘
Clark failed to satisfy his burden of proving that his appellate counsel’s performance was deficient or that the performance prejudiced him. Therefore, the circuit court properly denied these claims of ineffective assistance of appellate counsel.
*313 IV.
Clark also contends on appeal that his trial counsel were ineffective during the penalty phase of his trial and during the sentencing hearing before the trial court. We address each of Clark’s claims, as best we can discern them, in turn.
A.
First, Clark appears to contend that his trial counsel were ineffective during the penalty phase of the trial for not objecting to statements and arguments by the prosecutor regarding Clark’s burden in relation to mitigating circumstances generally, and particularly the mitigating circumstance in § 13A-5-51(6), Ala.Code 1975 — that his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Clark asserts that the prosecutor improperly argued to' the jury‘during the penalty phase of his trial that he had to prove mitigating circumstances by a preponderance of the evidence and improperly argued to the trial court before the penalty phase of 'the trial began that to prove the mitigating circumstance in § 13A-5-51(6), Clark had to prove that his voluntary intoxication rose to the same level that would have been required during the guilt phase of the trial to negate specific intent, i.e., to the level of insanity.[5] In its order, the circuit court found that Clark had failed to prove either of these claims. We agree.
Clark failed to present any evidence regarding'either of these claims at the evidentiary hearing. He did not question his trial counsel about these claims or even mention them, at the hearing. As the circuit court noted in its order, the only evidence dark presented at the hearing that even remotely touched on these claims was when he asked May whether May had asserted diminished capacity as a mitigating circumstance during the penalty phase of the trial, to which question May replied that he did not remember. “[A] petitioner is deemed to have abandoned a claim if he fails to present any evidence to support the claim at the evidentiary hearing.” Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005). See also Bryant v. State, 181 So.3d 1087, 1131 (Ala.Crim.App.2011) (opinion. on return to second remand); Jackson v. State, 133 So.3d 420, 435-36 (Ala.Crim.App.2012) (opinion on return to remand); Burgess v. State, 962 So.2d 272, 300 (Ala.Crim.App.2005) (opinion on application for rehearing); and Payne v. State, 791 So.2d 383, 399 (Ala.Crim.App.1999). Therefore, Clark is deemed to have abandoned these claims at the hearing and he cannot now reassert these abandoned claims on appeal.
Moreover, even if these claims are not deemed abandoned, because Clark failed to question his counsel about these claims, the record is silent as to the reasoning behind counsel’s actions. ‘When a record is silent as to the reasons for an attorney’s actions we must presume that counsel’s conduct was reasonable.” Hooks v. State, 21 So.3d 772, 793 (Ala.Crim.App.2008). Generally, “whether to object is a matter of trial strategy.” Davis v. State, 9 So.3d 539, 552 (Ala.Crim.App.2008).
“The fact that counsel did not object at every possible instance does not’ mean that the appellant did not receive adequate representation. O’Neil v. State, *314 605 So.2d 1247, 1250 (Ala.Cr.App.1992). Objections are a matter of trial strategy, and an appellant must overcome the presumption that ‘counsel’s conduct falls within the wide range of reasonable professional assistance,’ that is, the presumption that the challenged action ‘might be considered sound trial strategy.’ Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (1984).”
Moore v. State, 659 So.2d 205, 209 (Ala.Crim.App.1994). The failure to object to argument is generally considered to be “within the ‘wide range’ of reasonable professional assistance for which a strong presumption of sound judgment is due.” Thomas v. State, 766 So.2d 860, 929 (Ala.Crim.App.1998), aff’d, 766 So.2d 975 (Ala.2000), overruled on other grounds, Ex parte Taylor, 10 So.3d 1075 (Ala.2005).
Because he failed to question trial counsel about these claims or present any other evidence at the hearing regarding these claims, Clark necessarily failed to prove that his counsel’s decision not to object to the prosecutor’s allegedly improper arguments was not sound trial strategy. See, e.g., Hall v. State, 979 So.2d 125, 168-69 (Ala.Crim.App.2007) (holding that Rule 32 petitioner failed to prove claim that trial counsel was ineffective for not objecting to allegedly improper comment by the prosecutor when petitioner failed to present any evidence of that claim at the Rule 32 evidentiary hearing).
Because Clark failed to satisfy his burden of proof regarding these claims, the circuit court properly denied these claims of ineffective assistance of counsel.
B.
Second, Clark appears to argue generally that his trial counsel were ineffective for not giving an effective closing argument during the penalty phase of the trial and for not presenting a coherent mitigation defense.[6] Clark asserts that his counsel failed to “explain why the facts were mitigating” and to “argue a coherent mitigation theory” (Clark’s brief, p. 52), and that, instead, counsel argued against the death penalty in general, which, he claims, is “ipso facto ineffective.” (Clark’s brief, p. 53.) Clark also complains that his counsel’s mitigation defense “was too short and difficult for the jury and [the trial judge] to understand.” (Clark’s brief, p. 50.)
In its order, the circuit court denied these claims as follows:
“In paragraphs 191-192, Clark contends that trial counsel were ineffective for failing to give an effective penalty phase closing argument. Specifically, Clark argues that trial counsel failed to explain why certain facts were mitigating, failed to present a ‘coherent mitigation theory,’ and spent much of the closing argument arguing against the death penalty. At the hearing, Clark discussed a trial attorney’s duty to guide the jury in opening and closing arguments. (Tr. 89) Clark also inquired into whether trial counsel remembered arguing against the death penalty during the penalty phase, but trial counsel could not recall what they argued. (Tr. 27)
“Clark failed to prove that trial counsel were deficient. Clark did not ask any questions regarding why trial counsel chose their specific closing argument. In addition, several of trial counsel’s responses indicated that their closing argument was a deliberate and strategic decision. While trial counsel could not *315 recall making the specific arguments that they did, when asked whether he remembered arguing that the death-penalty was wrong, lead trial counsel responded, ‘I hope I did.’, (Tr. 28) In addition, trial counsel’s argument against the death penalty was -aimed at keeping the jury from using vengeance or deterrence as a reason for imposing death. (R. 1656-58) Because Clark offered no evidence to show why trial counsel chose their closing argument and because the record and evidence presented at the hearing indicate that trial counsel developed their argument strategically and deliberately, Clark failed -to prove that trial counsel were deficient.
“Further, Clark failed to prove prejudice. Neither at the hearing nor m his petition did Clark present any alternatives that would have had a reasonable likelihood of altering the result of trial. Instead, Clark made the unsupported assertion that trial counsel should have better explained the mitigating facts and should not have argued against the death penalty.
“Once again, Clark failed to carry his burden of proof with regard to this allegation and it is DENIED. Ala. R.Crim. P., Rule 32.3.
[[Image here]]
“In paragraphs 193-194, Clark contends that trial counsel were ineffective for putting on a mitigation defense that was not only too short but was also too difficult for the jury to understand. At the hearing, Clark inquired into the mitigating circumstances that trial counsel presented. (Tr. 101-04) Trial counsel, however, could not recall much of this information.(Tr. 101-04)
“Clark failed to establish the lengthier mitigation defenses that were available and would have been ‘easier’ for the jury to understand. Thus, the prejudice argument appears to.be based on the fact the Court did not find the existence of any mitigating circumstances. This is an inappropriate prejudice argument. The Court found no mitigating circumstances because none existed. Clark’s burden in this proceeding was to plead and prove, ‘lengthier defenses’ that would be ‘easier’ to understand. He did' not plead or prove either of these things.
“Clark failed to establish that trial counsel provided deficient performance or that he suffered prejudice.. Accordingly, Clark failed to carry his-burden of proof with regard to this allegation; therefore, it is DENIED. Ala. R.Crim. P., Rule 32.3.”
(C. 612-14; capitalization in original.) The circuit court’s findings are supported by the record.
It is well settled that closing argument is generally a matter of trial strategy. See, e.g., Behel v. State, 405 So.2d 51, 52 (Ala.Crim.App.1981). See also Ortiz v. State, 866 S.W.2d 312, 315 (Tex.Ct.App.1993) (“Which witnesses to call, and what type of closing argument to make, are clearly trial strategy”). Indeed, “[c]losing argument is an area where trial strategy is most evident.” Flemming v. State, 949 S.W.2d 876, 881 (Tex.Ct.App.1997). “[Sjpecial deference is due to an attorney’s closing argument, strategy because it is ‘an inherently subjective task.! ” Johnson v. State, 612 So.2d 1288, 1299 (Ala.Crim.App.1992) (quoting Thompson v. Wainwright, 787 F.2d 1447, 1455 (11th Cir.1986)). Moreover, “counsel’s method of presenting mitigation ... [is] clearly trial strategy.” Hertz v. State, 941 So.2d 1031, 1044 (Fla.2006). See also People v. Ratliff, 41 Cal.3d 675, 697, 224 Cal.Rptr. 705, 715 P.2d 665, 678 (1986) (“[T]he manner of presenting evidence [is] one of trial tactics properly vested in counsel.”). “[T]he pres *316 entation of mitigating evidence is a matter of trial strategy.” State v. Keith, 79 Ohio St.3d 514, 530, 684 N.E.2d 47, 63 (1997). “Matters of trial tactics and trial strategy are rarely interfered with or second-guessed on appeal.” Arthur v. State, 711 So.2d 1031, 1089 (Ala.Crim.App.1996), aff’d, 711 So.2d 1097 (Ala.1997).
As the circuit court noted in its order, although Clark questioned May generally about the importance and function of opening statements and closing arguments, Clark failed to question May specifically about May’s strategy for -opening statements and closing arguments during the penalty phase of Clark’s trial. Additionally, other than questioning -counsel regarding what mitigating circumstances were established by the evidence .and offered at trial,[7] Clark failed to question May regarding his strategy for the manner of presenting Clark’s mitigation defense. Nor did Clark present any evidence of an alternative manner of presenting the mitigation evidence that he believed would have been “easier” for the jury to understand. As noted previously, “[w]hen a record is silent as to the reasons for an attorney’s actions we must presume that counsel’s conduct was reasonable.” Hooks v. State, 21 So.3d 772, 793 (Ala.Crim.App.2008). “‘Without some explanation as to why counsel acted as he did, wé presume that his actions were'the product of an overall strategic plan.’ ” Washington v. State, 95 So.3d 26, 54 (Ala.Crim.App.2012) (quoting Tong v. State, 25 S.W.3d 707, 714 (Tex.Crim.App.2000)).
Moreover, contrary to Clark’s belief, á general argument against the death penalty, is not per se ineffective assistance of counsel. As the Indiana Supreme Court explained:
“As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase. See Canaan v. State, 683 N.E.2d 227, 234 (Ind.1997); Wallace v. State, 553 N.E.2d 456, 472-73 (Ind.1990); Townsend v. State, 533 N.E.2d 1215, 1232-34 (Ind.1989). After an investigation into potentially mitigating evidence, a defense counsel may decide that it would be better for his client not to argue, as mitigation evidence, defendant’s background history such as a history of drug abuse and a bad family life. See Canaan, 683 N.E.2d at 234; Wallace, 553 N.E.2d at 472-73; Townsend, 533 N.E.2d at 1234. Instead, defense counsel may determine that the better strategy would be to attack the, morality and effectiveness of the death penalty itself and inform the jury , that, if sentenced to a term of years, the defendant would likely spend the remainder of his life in prison. See Canaan, 683 N.E.2d at 234; Townsend, 533 N.E.2d at 1234.”
Timberlake v. State, 690 N.E.2d 243, 261 (Ind.1997). Here, Clark failed to present any evidence at the Rule 32 hearing indicating that May’s decision to argue against the death penalty was not sound trial strategy.
Clark failed to prove that his trial counsel were ineffective for allegedly not making an effective closing argument or presenting a coherent mitigation defense during the penalty phase of Clark’s trial. Therefore, the circuit court properly denied these claims of ineffective assistance of counsel.
*317 C.
Clark further contends that “[t]here were numerous mitigating factors that were established by the record in Clark’s case” (Clark’s brief, p. 54), and he appears to take issue with the trial court’s not finding in its sentencing order that any of those-mitigating circumstances existed, and with this Court’s holding on direct appeal that the circuit court’s finding in this regard was not erroneous, Clark also appears to claim that his trial counsel either did, not present evidence of mitigating circumstances to the jury and the trial court or did not adequately.argue the “legal significance” of mitigating circumstances to the jury and the trial court. (Clark’s brief, p. 73.) Specifically, Clark lists in his brief the following mitigating circumstances he claims . existed in his case: (1) that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired because of his cocaine addiction; (2) that, at the time of the crime, he was acting under an extreme mefital or emotional disturbance as the result of his cocaine addiction and his lack of sleep the night before the murder; (3) that he did not have a significant history of prior criminal activity; (4) that he expressed remorse for the crime; (5) that he had not slept the night before the murder; (6) that he had a long-term addiction to illegal narcotics; (7) that one of the jurors recommended a sentence of life imprisonment without the possibility of parole; (8) that there was a history of substance abuse in. his family; (9) that he had a positive family relationship with his ex-wife, his children, his grandchildren, and his parents; (10) that he was a hard worker; (11) that he cooperated with law enforcement; and (12) mercy.
To the extent that Clark is arguing that the trial court erred in not finding the above 12 mitigating circumstances to exist, this claim is, as .found by the circuit court, precluded by Rule 32.2(a)(4), because it was raised and rejected by this Court on direct appeal. See Clark, 896 So.2d at 649-53.
To the extent that Clark is arguing that this Court erred in upholding on direct appeal the circuit court’s finding that no mitigating circumstances existed, Rule32 is not the proper avenue for raising this claim. The proper avenue by which to challenge this Court’s holding in its opinion on direct appeal was in an application for rehearing and then a petition for certiorari review filed with the Alabama Supreme Court. See, e.g., Harris v. State, 947 So.2d 1079, 1112 n. 6 (Ala.Crim.App.2004) (“The proper avenue to challenge this court’s factual findings is in an application for rehearing.”), aff’d, 947 So.2d 1139 (Ala.2005), overruled on other grounds by Ex parte Jenkins, 972 So.2d 159 (Ala.2005).
To the extent that Clark’s argument is that his trial counsel were effective for not presenting evidence of, or adequately arguing the existence of, the above 12 mitigating circumstances, the circuit court noted in its order:
,“At the hearing, trial counsel confirmed that evidence existed of Clark’s remorse, drug use. and lack of sleep immediately preceding the murder, cooperation with law enforcement, history of drug use, and history of hard work. (Tr. 102-03) Trial counsel presented evidence of Clark’s remorse (R. 1548-50) and his drug use (R. 1544). In addition, the Court’s sentencing order discusses Clark’s long history of drug abuse and drug use the night preceding, the murder as potential mitigating evidence. (C. 11,12)
“Clark did not inquire into why trial counsel chose to emphasize the mitigating factors that they did —
*318 “In addition, because trial counsel confirmed at the hearing that the evidence presented in the penalty phase was consistent with the facts they uncovered in their investigation (Tr. 128), trial counsel’s decision to present the mitigating evidence that it did was likely an informed, strategic decision. Consequently, Clark fails to satisfy his burden of proving that trial counsel was deficient. While the length of trial counsel’s opening and closing argument during the penalty phase may have been brief, this fact alone is insufficient to show that trial counsel was ineffective in regards to this claim.
“Third, the evidence presented by Clark failed to prove that trial counsel’s alleged deficiency affected the outcome of the penalty phase. The Court was presented with no additional evidence of mitigation to consider.
“For these reasons, Clark failed to carry his burden of proof with regard to this allegation and it is DENIED. Ala.R.Crim.P., Rule 32.3.”
(C. 611-12; capitalization in original.) We agree with the circuit court.
First, the record from Clark’s direct appeal reflects that some evidence of 10 of the 12 alleged mitigating circumstances was, in fact, presented to the jury, either during the guilt phase or penalty phase of Clark’s trial. During the guilt phase, evidence was presented indicating that Clark had not slept the night before the murder and that Clark had cooperated with law enforcement after his arrest. During the penalty phase of the trial, trial counsel called Dr. Marianne Rosenzweig, a clinical psychologist who had also testified during the guilt phase of the trial, and Dawn Clark, Clark’s ex-wife, to testify. Through those two witnesses some evidence was presented that Clark’s ability to appreciate the criminality of his conduct or tó conform his conduct to the requirements of the law was impaired as a result of his cocaine addiction;- that Clark was suffering from a mental or emotional disturbance as a result of his cocaine addiction; that Clark had expressed remorse for the crime; that Clark had a long-term addiction to illegal narcotics; that there was a history of substance abuse in Clark’s family; that Clark had a positive relationship with his relatives; and that Clark was a hard worker, working full-time even while suffering from a severe cocaine addiction. Counsel cannot be ineffective for-not presenting evidence that counsel did, in fact, present.
Although counsel presented no “evidence” of mercy during Clark’s trial, mercy is an argument not susceptible of evidentiary proof. See, e.g., State v. Andriano, 215 Ariz. 497, 507, 161 P.3d 540, 550 (2007) (recognizing that mercy “is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case,” but a defendant “cannot ... prove ‘mercy’ by any standard”), abrogated on other grounds, State v. Ferrero, 229 Ariz. 239, 274 P.3d 509 (2012). Likewise, because the jury’s sentencing recommendation came after the evidentiary portion of the penalty phase of the trial, it would have been impossible for counsel to have presented “evidence” to the jury that one of the jurors had voted for life imprisonment without the possibility of parole. Counsel cannot be ineffective for not presenting “evidence” that was impossible to present. Moreover, when the jury returned its sentencing recommendation, the trial court read the recommendation aloud on the record, stating that 11 jurors had voted for death and 1 juror had voted for life imprisonment without the possibility of parole. Therefore, the trial *319 court was clearly aware that one of the jurors had voted for life imprisonment without the possibility of parole.
Second, the record from Clark’s direct appeal does reflect that May did not specifically argue to the jury or to the trial court that each'of the above-listed circumstances constituted a mitigating circumstance. Rather, May specifically argued only the first three mitigating circumstances listed above — that Clark’s1 ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; that Clark was suffering from an extreme mental or emotional disturbance; and that Clark did not have a significant history of prior criminal activity. However, as the circuit court noted in its order, Clark failed to question May at the hearing regarding why. May chose to emphasize those three mitigating factors. Indeed, other than general questioning regarding the importance of opening and closing statements, the only evidence presented by Clark at the hearing to support this claim was the following testimony:
“[Rule 32 counsel]: Now, the mitigating factors that you presented at sentencing were that there was no substantial criminal history, that Mr. Clark acted with extreme emotional disturbance, that he had a diminished capacity, and good behavior in jail. Are those the mitigators that you recall -presenting?
“[May]: I don’t recall but — .
“[Rule 32 counsel]: Does, that sound about right?
“[May]: Seemed to me there were others but I don’t remember.
“[Rule 32 counsel]: Okay.
“[May]: [The trial judge] didn’t find any.
“[Rule 32 counsel]: Yes, sir. Now, as to the good behavior in jail, do you recall that [the prosecutor] was able to -rebut that and establish or suggest that there was evidence of an escape and a fight while incarcerated?
“[May]: Seems to me, I remember that. I can’t really say yes or no right now but vaguely I think so.
“[Rule 32 counsel]: And that evidence might suggest future dangerousness in the defendant. Would that be fair to say?
“[May]: Could.
“[Rule 32 counsel]: Right. And that’s not a statutory aggravator under Alabama law? .
“[May]: No: I don’t think so.
“[Rule 32 counsel]: So the jury may have heard evidence about things that it otherwise would not have had it not been claimed-that he had a good behavior record in jail? ‘
“[May]: Yes.
“[Rule 32 counsel]: - Now, there was evidence -to suggest that Mr. Clark had expressed remorse for the crime? !
“[May]: Yes.
“[Rule , 32 counsel]: And you didn’t argue to the jury that that was a miti-gator?
“[May]: Í don’t know whether I did or not.
“[Rule 32 counsel]: You don’t recall arguing that?
“A. No.
“[Rule 32 counsel]: And you didn’t ask the judge to instruct the jury that remorse was a mitigator?
“[May]: I don’t know. I haven’t looked at our requested instructions. If you say I didn’t, I probably didn’t. .
•' “[-Rule 32 counsel]: Yes, sir. And would it be fair to say that you didn’t argue to-the judge at that sentencing *320 that the remorse was a mitigating factor?
“[May]: I don’t know. I assume by
your question that I didn’t.
' “[Rule 32 counsel]: Yes, sir. The other mitigators — were these other miti-gators — was there evidence of these other mitigators in the case that .Mr. Clark had not slept the night before the murder, that Mr. Clark had a long-term addiction to illegal narcotics beginning when he was 15- or 16-years-old, that there was a history of substance abuse in the family, that Mr. Clark was a hard worker working for over 30 years despite his substance abuse problems, and that he cooperated with law enforcement? Was there evidence supporting each one of those?
“[May]: Yes.
“[Rule 32 counsel]: And is it not true that you didn’t argue those facts to the jury as a mitigating circumstance?
“[May]: I guess. I. didn’t.
“[Rule 32 counsel]: .Would that also be the case, that you didn’t [ask] for a jury instruction as to those mitigating circumstances?
“[May]: Again, I guess I didn’t.
“[Rule 32 counsel]: And as well, you didn’t argue to the judge that those were mitigators at the sentencing?
“[May]: I guess not.”
(R. 101-04.)
Clark presented no other evidence to support this claim. As the circuit court correctly found, Clark failed to question his counsel about the reasons they chose to emphasize the mitigating circumstances they did and the reasons they made the arguments they did during the penalty phase of the trial. Simply put, Clark’s questioning of May established what May did and did not argue at the-penalty phase of Clark’s trial, but it utterly, failed to establish that May’s actions were not the result of reasonable trial strategy. As explained previously, “[w]hen a record is silent as to the reasons for an attorney’s actions we must presume that counsel’s conduct was reasonable.” Hooks v. State, 21 So.3d 772, 793 (Ala.Crim.App.2008). “ ‘If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on. [an] ineffective assistance of counsel claim.’ ” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)).
Moreover, we point out that on cross-examination, the State elicited the following testimony from May regarding counsel’s penalty-phase strategy:
“[Assistant attorney general]: As far as the mitigation case that you put on, would it be fair to say that you started prepping the ground for your mitigation case in the guilt phasé of the trial?
’ “[May]: Huh-uh.
“[Assistant attorney general]: It would not be fair to?
“[May]: Oh, in the guilt. Well, in the guilt, phase of the trial, yes.
“[Assistant attorney general]: So some of the information that was'coming out in the guilt phase, you felt like if Mr. Clark was convicted, would be useful in presenting a case for life?
“[May]: We hoped so, yes.
“[Assistant attorney general]: And through Dr. Rosenzweig, you put on a very vivid picture of someone who had a fairly normal childhood; had • been a good father, a good husband, a good provider, a good son; and whose life was turned upside-down, from a decision to begin using crack cocaine. Is that a fair assessment of your penalty phase strategy?
*321 “[May]: That’s what we had. Yes, it is.
[[Image here]]
“[Assistant attorney general]: Did Mr. McCall [the defense investigator] or Dr. Rosenzweig ever come to you -and say Mr. Clark didn’t have a normal childhood, he wasn’t a good husband, he wasn’t a good provider, this isn’t about crack cocaine?
“[May]: No.
“[Assistant attorney general]: So the case that you put on in mitigation for Mr. Clark was consistent with the facts as you through your own investigator, through the Alabama Prison Project, and through your own court-appointed expert went out and investigated the facts, they were all consistent with what you ultimately put on at trial?
“[May]: Yes.”
(R. 127-28.) William Pheifer also testified at the hearing, on cross-examination- by the State, that the defense strategy during the penalty phase of the trial was “to show this was a good man who got into drugs and it ruined his life.” (R. 154.)
Counsel’s testimony clearly indicated that they had a defense strategy in place for the penalty phase of the trial, and the record from Clark’s direct appeal reflects that counsel followed that strategy. Clark failed to present any evidence indicating that counsel’s strategy was unreasonable. Clark likewise failed to present any evidence indicating that there is a reasonable probability that, had counsel pursued a different strategy or made additional or different arguments to the jury or the trial court, the outcome of his trial would have been different, i.e., that but for counsel’s alleged errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Simply put, Clark failed to ' satisfy ⅛ burden of proving that his counsel’s performance was deficient or that he was prejudiced by it. •
For the above-stated reasons, the circuit court properly denied these claims of ineffective assistance of counsel.
D.
.Finally, Clark contends that his trial counsel were ineffective, during the sentencing hearing before the trial court. He argues that counsel “should have prepared a legal memorandum or made a “well-planned closing argument to [the trial judge] citing the facts,1 law, and argument made in this brief "on how and why the crack cocaine, withdrawal, and sleep deprivation- were substantial mitigators.” (Clark’s brief, p. 78.) According to Clark, in the sentencing order, the trial judge “made nutnerous findings of mitigating evidence [but] just did not know what the legal significance of [the] findings was” and, thus,1 a memorandum of law would have helped the trial judge understand the law. (Clark’s brief, p. 78.)
In its order, the circuit court denied this claim as follows:
“In paragraphs 203-204, Clark contends that his trial counsel were ineffective for not preparing a legal memorandum or closing argument addressing the fact that crack cocaine; withdrawal from crack - cocaine, and' sleep deprivation were ‘substantial’ mitigating circumstances and/or listing other mitigating circumstances.
“Clark, failed to prove prejudice in regard to this claim. During the penalty phase, trial counsel presented testimony regarding Clark’s drug use and its impact on his mental state and behavior. (R. 1542-45) Trial counsel also specifically asked a witness about Clark’s drug *322 use in relation to an extreme or emotional disturbance. (R. 1542) In addition, before determining that no mitigating factors exist, the Court expressly considered Clark’s drug abuse as mitigating evidence. (C. 11-12) At the hearing, Clark failed to present any evidence that would show a memorandum or more extensive closing argument was reasonably likely to alter the result of trial. Clark did not even submit a sample memorandum to illustrate what he alleges trial counsel were ineffective for failing to do.
“Clark further failed to prove that trial counsel were ineffective. While Clark asked trial counsel whether evidence existed regarding his sleep deprivation and about the presentation of the other mitigating evidence, Clark did not inquire into why trial counsel chose to present the mitigating evidence in the way that they did. Because the record is silent regarding the rationale for trial counsel’s decisions, Clark fails to show that trial counsel acted unreasonably.
“For these reasons, this claim is DENIED. Ala. R.Crim. P., Rule 32.3.”
(C. 622-23; capitalization in original.)
The circuit court’s findings are correct and are supported by the record, and we adopt them as part of this opinion. For the reasons stated in the circuit court’s order, the circuit court properly denied this claim of ineffective assistance of counsel.
V.
Based on the foregoing, the judgment of the circuit court denying Clark’s Rule 32 petition is affirmed.
AFFIRMED.
WELCH and BURKE, JJ., concur.
JOINER, J., concurs in part and concurs in the result, with opinion.
WINDOM, P.J., recuses herself.

. The record does not indicate the reason for the circuit court's seven-year delay in ruling on the petition after the hearing was conducted,

. Clark's petition was, in large part, difficult to follow. Most of his "claims” were not specifically delineated in the petition and were difficult to ascertain. Even the State noted in its answer to the petition that Clark’s petition was so "disorganized and difficult to follow” that "there [wa]s no way for [the circuit court] to determine the majority of the claims ... by simply looking at [the] petition,” and that, in its response, it did its best "to discern what Clark was even attempting to allege as claims” and to answer the petition in such a manner as to "bring ... some organization and clarity” to assist the circuit court. (C. 285-86.) Much of Clark’s brief on appeal is likewise difficult to follow. To the extent that Clark intended to raise on appeal any claim not specifically addressed in this opinion, that claim was not sufficiently delineated and argued in Clark’s brief to satisfy the requirements in Rule 28, Ala. R.App. P., and is, therefore, deemed waived. See C.B.D. v. State, 90 So.3d 227, 239 (Ala.Crim.App.2011) (“Failure to comply with Rule 28(a)(10) has *300 been deemed' a waiver of the issue presented.").

. Although the specifics of this claim are not readily apparent from Clark’s petition or his brief on appeal, at the evidentiary hearing on the petition, Clark’s Ruíe 32 counsel made clear that the claim was that "the defenses that were presented ... were unreasonable and not supported by the evidence and that the one defense [Clark] had, that this is a felony murder case and not a capital case, was ignored completely.’’ (R. 79-80.)

. We recognize that our holding on direct appeal regarding the propriety of a jury instruction on heat-of-passion manslaughter was on application of the standard of review ' for plain error. See Rule 45A, Ala. R.App. P. In Ex parte Taylor, 10 So.3d 1075 (Ala.2005), the Alabama Supreme Court explained:
"Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel. In determining whether to grant a Rule 32 petitioner relief on an ineffective-assistance claim, a court must examine both the plain-error and prejudice standards of review.”
10 So.3d at 1078. In other words, a finding of no plain error regarding an underlying substantive issue on direct appeal is a relevant factor to consider in determining whether a petitioner was prejudiced by counsel’s deficient performance relating to that substantive issue, but it is not determinative. See Lee v. State, 44 So.3d 1145, 1163 (Ala.Crim.App.2009). As noted, however, we do not reach the prejudice prong of Strickland on this claim of ineffective assistance of counsel because we conclude — based on our holding on direct appeal that there was no reasonable theory of the evidence to support a charge on the lesser-included offense of heat-of-passion manslaughter — that counsel’s performance was not deficient. Therefore, Ex parte Taylor is inapplicable here.

. "[V]oluntary intoxication is not a defense ‘unless the degree of intoxication amounts to insanity.’ ” Mashburn v. State, 148 So.3d 1094, 1126 (Ala.Crim.App.2013) (quoting Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), aff’d on return to remand, 625 So.2d 1141 (Ala.Crim.App,1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993)).

. In Part IV. C. of this opinion, we address Clark’s more specific claim that counsel was ineffective for not presenting evidence of, or adequately arguing the existence of, several mitigating circumstances.

. See Part IV. C. of this opinion, in which we quote a portion of May's testimony from the hearing.